NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: <br> EDWARD GILLIAM, <br>            Debtor. | BAP No. CC- 25-1188-SGL |
| EDWARD GILLIAM, <br>            Appellant, <br> v. <br> BARBARA WHITE, <br>            Appellee. | Bk. No. 8:12-bk-13356-SC <br><br> **MEMORANDUM**[*] |

Appeal from the United States Bankruptcy Court
for the Central District of California
Scott C. Clarkson, Bankruptcy Judge, Presiding

Before: SPRAKER, GAN, and LAFFERTY, Bankruptcy Judges.

## INTRODUCTION

Chapter 7[1] debtor Edward Gilliam appeals from an order denying his motion seeking contempt sanctions against Barbara White for alleged violation of two discharge injunctions entered in separate bankruptcy cases

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Local Rule" references are to the Local Bankruptcy Rules for the Central District of California.

he filed in 2008 and 2017. He and White were in an on-again, off-again relationship that began before the first bankruptcy and ended after the second. According to Edward,[2] White knowingly violated the discharge injunctions by suing him in state court for claims arising from an alleged $30,000 loan, an alleged conversion of White's bedroom furniture, and an alleged breach of a settlement intended to resolve the first two claims.

The bankruptcy court disagreed with Edward. As the court found, Edward failed to prove by clear and convincing evidence that any of White's claims arose in time for the discharge from the 2008 bankruptcy to apply. The court further found that to the extent the 2017 discharge applied to any of White's claims, Edward failed to prove by clear and convincing evidence that she knew of the 2017 discharge when she filed her state court lawsuits. Neither finding is clearly erroneous on the record presented.

Edward misapprehends the limited scope of his motion for contempt and this appeal. He has exerted considerable effort challenging the substance of White's claims and arguing other issues tangential to contempt. But the principal inquiry underlying a motion for violation of the discharge injunction only asks whether the *alleged* creditor is *attempting* to collect a discharged debt from the debtor who received the discharge. The underlying merits of the alleged claims ordinarily are not addressed in

---

[2] We refer to Edward by his first name for ease of reference and to readily distinguish him from his mother Maxine, who also played a role in the events leading up to Edward's contempt motion. No disrespect is intended to either of them.

disposing of contempt motions because the merits typically are irrelevant. Based on our review, we recognize that Edward strongly believes that White's claims are invalid and unenforceable. But as the bankruptcy court determined, either the discharge injunction did not apply to the underlying claims or White did not have knowledge of the applicable discharge. By the time Edward moved for a holding of contempt in 2025, only one of White's state court lawsuits against him was still pending, and she dismissed him from that action upon learning of his discharge. At bottom, neither of the two key findings of the bankruptcy court was clearly erroneous. Therefore, we AFFIRM.

## FACTS[3]

### A.    The 2008 and 2017 bankruptcy filings.

As relevant to this appeal, Edward filed a chapter 7 no-asset bankruptcy case in 2008 and received a discharge in that bankruptcy in March 2009. He filed another chapter 7 no-asset bankruptcy in 2017 and received a discharge in that bankruptcy the same year it was filed. Edward never listed or served White as a creditor in his 2017 bankruptcy. In his 2008 bankruptcy, however, over time he filed at least six versions of his Schedule F list of unsecured creditors. White was not listed in the first three versions of his Schedule F. But well after entry of his discharge, Edward

---

[3] We exercise our discretion, when appropriate, to take judicial notice of documents electronically filed in the underlying bankruptcy cases. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

filed three additional amendments of his Schedule F—in 2010, 2011, and 2012. These three amendments all listed White as an unsecured creditor holding a "Consumer Debt" and stated that White's claim was incurred in 2009, which would have been postpetition.

**B.     The motion for contempt for violation of the discharge injunctions.**

In March 2025 Edward moved for entry of an order to show cause why White should not be held in contempt for violation of the discharge injunction. At that time, Edward only asserted a violation of the discharge injunction entered in the 2008 bankruptcy and argued that White violated it by commencing three lawsuits. The first two lawsuits were filed in 2023 and only named Edward as a defendant. The third one was commenced in 2024 and named both Edward and his mother, Maxine, as defendants.

White opposed the motion and Edward filed additional papers in support of the motion. On April 29, 2025, the bankruptcy court entered an order continuing the scheduled contempt motion hearing and directing Edward to file a single brief in support of his motion that would supersede all of his prior filings. As the court explained, the flurry of papers Edward filed contained a considerable amount of material that seemed irrelevant to the alleged violation of the discharge injunction and threatened to muddy the issues and record.

Pursuant to the court's order, Edward filed his amended motion on May 13, 2025. The amended motion sought a finding of contempt for commencing the three state court actions in violation of the discharges

entered in both the 2008 and 2017 bankruptcies. The amended motion was accompanied by Edward's declaration, Maxine's declaration, and numerous exhibits. According to Edward, White knew of his 2008 bankruptcy and the resulting discharge when she commenced her 2023 and 2024 state court lawsuits because they lived together at the time and had multiple discussions about his finances and the 2008 case. The exhibits to the amended motion included copies of the complaints and other filings from the three lawsuits, which form the basis for Edward's contempt motion.

## C. The alleged claims underlying White's lawsuits.

White's lawsuits originated from three alleged claims, each of which is described below.

### 1. The Furniture Claim.

In December 2023, White filed a small claims case in Riverside County against Edward for his alleged failure and refusal to relinquish possession of a bedroom set ("Furniture Claim"). She alleged that she purchased the furniture for roughly $8,000 while living with Edward, but the furniture always remained her separate property. She further alleged that in October 2023, she asked him to return the furniture, but he refused to allow her to remove the furniture from his residence when she attempted to do so.

### 2. The Loan Claim.

Also in December 2023, White filed a separate complaint against

5

Edward in Orange County for $30,000 allegedly lent ("Loan Claim"). This complaint stated that it sought relief for breach of contract, common counts, fraud, and "other" causes of action. The complaint sought damages of $30,000 and attorney's fees of $5,000. White alleged that there was an account stated in writing in which Edward agreed he was indebted to her for a debt made within the prior four years. She further alleged that she had lent Edward money within two years of filing this lawsuit.

Additionally, White asserted a claim for intentional or negligent misrepresentation. According to White, Edward promised that he would repay her within a year but never intended to do so. White's complaint did not specifically allege when this statement was made but alleged that she had withdrawn the money from a retirement account to fund the loan to Edward. The complaint further alleged that he had "reaffirmed" the debt and made a payment to her "in or about Oct. 2021, [with a] promise to pay the remaining balance of the debt within one year."

Throughout his amended contempt motion, Edward argued that the Loan Claim arose sometime during "the period she [White] cohabited with . . . Edward Gilliam in Yorba Linda, California—a timeframe that undisputedly predates Debtor's March 9, 2009, Chapter 7 discharge." These statements are consistent with his later amendments to his Schedule F, which identified his alleged debt to White as having been incurred in 2009. There is nothing in the record establishing that the period of the parties' cohabitation in Yorba Linda ended before Edward commenced the 2008

bankruptcy. To the contrary, Edward's argument in the amended motion indicates that he still resided there at the start of 2009—after commencement of the 2008 bankruptcy.[4]

### 3.     The Settlement Claim.

The amended contempt motion also included as an exhibit a letter to Edward and Maxine dated June 19, 2024, from Ayinde Jones, one of the state court attorneys representing White. The letter provided notice of White's intent to sue them if payment of $35,000 was not made to White pursuant to a settlement allegedly reached earlier in 2024. According to the letter, Edward, Maxine, and White met in April 2024 and agreed to dismissal of White's two pending lawsuits—with Edward and Maxine promising to pay White a total of $35,000 in exchange for the dismissals. ("Settlement Claim").

Also attached to the amended contempt motion was Edward's response to the June 19, 2024 demand letter—dated the same day. Among many other things, his June 2024 response discussed his 2008 bankruptcy and argued that White's collection efforts were barred by the discharge entered in that case. Edward also attached to the amended contempt motion a partial copy of the complaint seeking to enforce the Settlement

---

[4] Edward also argued that, in her complaint on the "Settlement Claim" (defined and discussed immediately below), White admitted that the Loan Claim arose before he filed his 2008 bankruptcy. But the complaint in question merely alleges that Edward is liable to her "for a loan she made to him when they were a couple living together in the City of Yorba Linda . . . ."

Claim, which he stated was filed on July 11, 2024.

**D.    The initial hearing on the amended contempt motion and supplemental briefing.**

After White opposed the amended contempt motion, the court held its initial hearing on June 3, 2025. Though he had represented himself in preparing and filing his moving papers, Edward was represented by counsel at the hearing. His counsel argued that even though White professed ignorance of the discharges in dispute, she could not legitimately deny such knowledge of the bankruptcy filings and discharges after June 2024. In support of this argument, counsel pointed the court to the June 19, 2024 demand letter from attorney Jones on the Settlement Claim and to Edward's immediate response. Both documents referenced the 2008 bankruptcy and discharge but did not mention the 2017 bankruptcy or discharge.

Whereas Edward focused on knowledge of the discharge, White focused on when her claims arose. She insisted that there was no evidence showing that any of her claims arose before Edward commenced his 2008 bankruptcy. As for the Loan Claim, White pointed out that Edward had admitted in his 2010 and 2011 amended Schedule F that this claim did not arise until sometime in 2009. For his part, Edward did not dispute this fact at the hearing. Instead, he *confirmed* it. His counsel advised the court that Edward had confirmed that any loan debt arose in January 2009, three months after he filed his 2008 bankruptcy.

8

The bankruptcy court then switched the inquiry to the 2017 discharge. The court asked White why—if the Loan Claim had been discharged by the 2017 bankruptcy—she later sued Edward in pursuit of that claim. White's answer was twofold. First, she maintained that she did not know about the 2017 bankruptcy when she sued on the Loan Claim— or even when she allegedly entered into the 2024 settlement agreement with Maxine and Edward. And second, she posited that the Settlement Claim, as against Maxine, was separate and distinct from Edward's debt. She further offered that Edward arguably had reaffirmed that debt by joining with Maxine in the settlement agreement.

The bankruptcy court rejected out of hand the notion that Edward reaffirmed his debt by joining in the 2024 settlement. The court pressed White as to when she was going to dismiss Edward from the surviving state court lawsuit on the Settlement Claim and indicated that she would be subject to a significant amount of sanctions if she did not do so forthwith.

After listening to the parties' arguments, the court stated that it intended to set the matter for an evidentiary hearing and subsequently entered an order setting the hearing for September 8, 2025. The order also set a briefing schedule permitting the filing of trial briefs and responses. The order further specified that at the evidentiary hearing, "[t]he parties *may* submit live evidence in the form of witnesses who may testify." (Emphasis added.)

9

White timely filed her trial brief. She argued that the evidence would show that she did not violate the discharge injunction but even if she did, that violation was not willful and would not support a contempt finding. She also filed a declaration executed by her state court counsel advising that White had dismissed Edward from the action on the Settlement Claim on June 17, 2025—fourteen days after the initial hearing on the contempt motion. This left Maxine as the only defendant in that action.

Edward's trial brief, filed pro se like all his other court papers, consisted of roughly 12 pages of argument, a new declaration, and roughly 185 pages of exhibits. As for his new declaration, Edward again claimed that his June 2024 response to White's demand letter regarding the Settlement Claim referenced both of his discharges. But as noted above, the response letter attached to his moving papers only referenced his first discharge entered in the 2008 bankruptcy.

Despite his prior oral and written statements indicating that the Loan Claim arose (if at all) in or around 2009, Edward now insisted that White gave him the funds from which the Loan Claim allegedly arose in 2008— before he filed his 2008 bankruptcy. In support of this contention, he referenced and attached numerous exhibits concerning multiple events that allegedly occurred in 2008. However, he failed to establish any concrete or meaningful connection between these seemingly disparate events and the Loan Claim.

In his responsive brief,[5] Edward pointed out that on April 29, 2025, he filed and served on White a supplemental request for judicial notice, which included copies of both of his discharges. Thus, he insisted that at the very latest White had "actual notice" of the 2017 bankruptcy and discharge no later than April 2025—rather than in June 2025, as she claimed in her opposition papers. However, he failed to show how White had knowledge of the 2017 discharge anytime prior to 2025. Edward also failed to explain why it made any difference whether White learned of the 2017 discharge in April 2025 as opposed to June 2025—for purposes of his claims of discharge violations that occurred in 2023 and 2024.

### E.     The evidentiary hearing.

The evidentiary hearing took place on September 8, 2025. Edward was again represented by counsel at the hearing, but counsel arrived late. The hearing began without Edward's counsel present. During this phase of the hearing, Edward represented himself. As Edward made his opening statement, the court asked him whether he had any evidence to present. Edward responded that "the evidence that's in my brief is the evidence that I would like to submit." The court then stated "Okay. So that's fine. Do you have any other evidence?" Edward, again in response, said "[n]o." White never objected to Edward's evidence attached to the motion and his briefing. Instead, White moved for a directed verdict. The court denied the

---

[5] White did not file a responsive brief.

motion, presumably based on Edward's evidence previously submitted with his briefing.

White's counsel then called White as the first defense witness. She testified that she did not "know" of Edward's 2017 bankruptcy case—or his 2017 discharge—until the date of the initial contempt hearing on June 3, 2025. She also testified that based on the court's remarks at the initial hearing, she instructed her state court counsel to dismiss Edward from the pending action to recover the Settlement Claim.[6] But White admitted to knowing of the 2008 bankruptcy as early as January 2024, based on the papers Edward filed in the action on the Loan Claim raising the discharge in the 2008 bankruptcy as a defense.

As for the timing of the Furniture Claim, White explained that she did not ask for the bedroom furniture back until her on-again, off-again relationship with Edward ended sometime in or around 2023.

By the time White finished her testimony, Edward's counsel had appeared. In the interests of justice, the court allowed Edward to reopen his case-in-chief and testify. Edward testified that in the action on the Loan Claim, White had filed papers in which she admitted that she knew of the 2017 bankruptcy. However, when cross-examined he was unable to identify or direct the court to where this alleged admission had been made.

---

[6] White's counsel in the action on the Settlement Claim likewise testified that she filed a request for the state court to dismiss Edward on or about June 17, 2025. Edward did not dispute that he was dismissed from that lawsuit in this timeframe.

Edward's other hearing testimony regarding notice did not distinguish between the 2008 bankruptcy and the 2017 bankruptcy. Virtually all of his testimony seemed to focus on notice of the 2008 bankruptcy. He also testified that he attempted multiple times to return the bedroom furniture to White when she asked for its return in 2023. Neither White nor Edward testified at the evidentiary hearing as to when the Loan Claim arose.

After his testimony, Edward's counsel confirmed that he had no other witnesses to call, and the court took the matter under submission. At no point during the hearing did either party formally offer any exhibits into evidence, nor did the court formally admit any exhibits.

## F.    The court's decision.

On September 29, 2025, the bankruptcy court entered an order denying the contempt motion. The court acknowledged as undisputed Edward's 2008 and 2017 bankruptcy filings and the resulting discharges. It similarly acknowledged that White commenced in December 2023 separate lawsuits on the Furniture and Loan Claims. It further noted she commenced an action on the Settlement Claim in July 2024. According to the court, Edward failed to prove by clear and convincing evidence that either bankruptcy discharge applied to White's claims or that White knew of the discharge injunctions when she commenced her state court actions. Specifically with respect to her knowledge of the 2017 discharge, the court found that White credibly testified "that she did not learn of the 2017 discharge until June 2025, at which time she promptly caused the [only

13

remaining] action against Debtor to be dismissed."[7]

On October 6, 2025, Edward timely filed a notice of appeal from the order denying his contempt motion. That same day, he also filed a motion seeking reconsideration of the court's order. The court entered an order denying the reconsideration motion on December 5, 2025. Edward did not file a new notice of appeal or an amended notice of appeal from the denial of his reconsideration motion. As a result, that denial is beyond the scope of our appellate review, per Rule 8002(b)(3). *See Olomi v. Tukhi (In re Tukhi)*, 568 B.R. 107, 112 (9th Cir. BAP 2017) (holding that the Panel lacked jurisdiction to review the disposition of a postjudgment motion seeking reconsideration of the court's final decision because the appellant failed to comply with Rule 8002(b)(3)).

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157. We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1.     Did the bankruptcy court misapply the legal standard for ascertaining an alleged contemnor's knowledge of a bankruptcy discharge as articulated in *Taggart v. Lorenzen*, 587 U.S. 554 (2019)?

2.     Did the bankruptcy court clearly err when it found that Edward

---

[7] The court did not specifically discuss the timing of the Settlement Claim. The court seemed to implicitly assume that it was derivative of White's other two claims—at least for purposes of considering when it arose.

14

failed to prove the applicability of the first discharge entered in the 2008 bankruptcy to any of White's claims?

3.     Did the bankruptcy court clearly err when it found that Edward failed to prove White's knowledge of the 2017 discharge at the time she filed the state court lawsuits?

## STANDARDS OF REVIEW

The first issue raised is a question of law, which we review de novo. De novo review means we give no deference to the bankruptcy court's decision on that issue. *See Kashikar v. Turnstile Cap. Mgmt., LLC (In re Kashikar)*, 567 B.R. 160, 164 (9th Cir. BAP 2017). The other two issues are factual in nature and subject to the clearly erroneous standard of review. A factual finding only is clearly erroneous if it is illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

## DISCUSSION

As a threshold matter, our review in this appeal has been impacted by the scope, volume, and content of Edward's appellate filings. We understand and appreciate that he filed his appeal papers pro se, though he has been represented by counsel at both hearings before the bankruptcy court and at oral argument in this appeal. But the matters included in his opening appeal brief go far beyond the narrow issues legitimately raised by the denial of his contempt motion. Our analysis addresses in full only those arguments that could justify reversal and only briefly comments on

15

some of Edward's other, tangential issues.[8]

## A.  Applicable law and Edward's standard of proof argument.

Section 524(a)(2) provides that a discharge "operates as an injunction against the commencement or continuation of an action . . . to collect, recover or offset any [discharged] debt as a personal liability of the debtor . . . ." Though the bankruptcy code does not provide a statutory remedy for violation of the discharge injunction, it may be enforced by way of contempt proceedings. *See Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir. 2002). To hold a party in contempt, the alleged contemnor must knowingly violate a clear court order. *Albert-Sheridan v. State Bar of Cal. (In re Albert-Sheridan)*, 658 B.R. 516, 538 (9th Cir. BAP 2024) (citing *ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.)*, 450 F.3d 996, 1007-09 (9th Cir. 2006)). Thus, a finding of contempt only is appropriate when the party seeking contempt sanctions shows by "clear and convincing evidence" that

---

[8] We also must decide which papers were properly before the bankruptcy court and considered by it in denying the contempt motion. There is inconsistency regarding the record the court indicated it was relying on among: (1) the court's statements at the September 8, 2025 evidentiary hearing; (2) the court's analysis in its September 29, 2025 order denying the contempt motion; and (3) the court's reasoning in its December 5, 2025 order denying Edward's reconsideration motion. Regardless, we have assumed without deciding that the court should have considered the contents of all papers filed by the parties before the court took the matter under submission at the conclusion of the September 8, 2025 evidentiary hearing. And we have considered those same papers in reviewing this matter for reversible error. *See generally Van Zandt v. Mbunda (In re Mbunda)*, 484 B.R. 344, 355 (9th Cir. BAP 2012) (stating that erroneous evidentiary rulings do not justify reversal "unless it is more likely than not that the rulings changed the outcome of the lawsuit"), *aff'd*, 604 F. App'x 552 (9th Cir. 2015).

the contemnor "(1) knew the discharge injunction was applicable and (2) intended the actions which violated the injunction." *In re ZiLOG, Inc.,* 450 F.3d at 1007.

While knowledge of the discharge injunction is a prerequisite to finding contempt, the case law cited above makes clear that Edward also needed to establish that White knew the discharge injunction applied to her actions against Edward to enforce her claims. An alleged contemnor's knowledge is measured under an objective standard, and a finding of contempt is permissible only "when there is no objectively reasonable basis" for the creditor to conclude that its actions "might be lawful" despite the discharge injunction. *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019).

In his briefing before the bankruptcy court and on appeal, Edward has repeatedly argued that it was White's burden to prove that she had valid claims against him—and when they arose. This argument misperceives the limited scope of a motion for contempt based on alleged violation of the discharge injunction. Such motions are not concerned with the underlying validity of disputed claims. More importantly, it is beyond cavil that as the movant seeking to hold White in contempt, Edward bore the burden to prove, by clear and convincing evidence, that the claims arose prepetition and that she knew the applicable discharge applied to those claims. *See Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1190-91 (9th Cir. 2003) ("The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and

convincing evidence that the contemnors violated a specific and definite order of the court." (citation omitted)).[9]

## B. Edward's arguments challenging the bankruptcy court's key factual findings.

On appeal, Edward also has challenged the bankruptcy court's findings as to when White's claims arose and when she knew of the discharges.

### 1. Timing of claims.

Pursuant to § 727(b), a bankruptcy discharge under § 727(a) "discharges a debtor from all debts that arose before [the] bankruptcy." *Heilman v. Heilman (In re Heilman)*, 430 B.R. 213, 218 (9th Cir. BAP 2010) (citing *Beezley v. Cal. Land Title Co. (In re Beezley)*, 994 F.2d 1433, 1434 (9th Cir.1993)). In the context of no-asset chapter 7 cases like Edward's 2008 and 2017 cases, the discharge applies to prepetition debts even when the subject creditor was neither listed in the debtor's schedules nor served with notice of the bankruptcy. *Id.* The first critical question we must address is whether

---

[9] Edward's counsel argued for the first time at oral argument that the Supreme Court's decision in *Taggart* abrogated the clear and convincing evidence standard of proof for finding contempt set forth in *ZiLOG* and *Dyer*. We disagree. *Taggart* gave no indication that it meant to overrule any aspect of Ninth Circuit law other than the subjective test this circuit formerly applied for determining an alleged contemnor's knowledge for purposes of finding contempt. *See generally In re Albert-Sheridan*, 658 B.R. at 538 (applying clear and convincing standard to the *Taggart* analysis). Accordingly, the clear and convincing evidence standard of proof is still good law, and we have no basis to depart from it. *See Deitz v. Ford (In re Deitz)*, 469 B.R. 11, 22-23 (9th Cir. BAP 2012) (citing *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)).

White's claims arose prepetition or postpetition for bankruptcy discharge purposes.

Edward argues that the bankruptcy court erred when it found he failed to prove that any of White's claims arose before he filed his bankruptcies. White pursued three claims against Edward: (1) the Loan Claim, (2) the Furniture Claim, and (3) the Settlement Claim. Under Ninth Circuit law, "a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law." *Picerne Constr. Corp. v. Castellino Villas, A.K.F. LLC (In re Castellino Villas, A.K.F. LLC)*, 836 F.3d 1028, 1034 (9th Cir. 2016) (quoting *SNTL Corp. v. Ctr. Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826, 839 (9th Cir. 2009)). We will address each of White's claims in turn.

### a. Furniture Claim.

The court treated the Furniture Claim as a claim for conversion. Neither party has challenged this point, so we accept it as correct for purposes of this appeal. As the court explained, a conversion does not occur under California law unless the defendant wrongfully interferes with the plaintiff-owner's right to possession of the property. *See Rebel Distribs. Corp. v. Devos, Ltd.*, 376 F. App'x 772, 774 (9th Cir. 2010) (citing California cases).

The court expressed doubt that White's evidence established the existence of a valid conversion cause of action because it was unclear on the record presented that Edward ever unreasonably failed or refused to

19

relinquish possession of the bedroom set to White. The court explained that any such cause of action could not have accrued unless Edward wrongfully interfered with White's right to possess the bedroom set.[10] Nonetheless, the court correctly recognized that the validity of White's claim was not at issue; the question before the court was when such a claim might have arisen under the Ninth Circuit's fair contemplation test: when White reasonably could contemplate the existence of her alleged conversion claim—regardless of whether a cause of action for conversion actually had accrued under applicable nonbankruptcy law. *See In re Castellino Villas, A. K. F. LLC*, 836 F.3d at 1034; *In re SNTL Corp.*, 571 F.3d at 839.

According to the court, White's Furniture Claim arose, if at all, sometime in 2023, when she first sought to recover the bedroom set from Edward. This finding was supported by White's evidentiary hearing testimony. She testified that she did not ask Edward to return the bedroom set to her until their on-again, off-again relationship completely ended sometime after 2020. Up to that point, White willingly entrusted Edward with possession of the bedroom set. Edward submitted no contrary evidence. Nor did he meaningfully challenge White's testimony regarding the timing of this claim.

On this record, the relevant finding regarding the timing of the

---

[10] This is consistent with California law governing bailment and conversion. *See Grosso v. Monfalcone, Inc.*, 13 Cal. App. 2d 405, 409-10 (1936); *Wolfe v. Willard H. George, Inc.*, 110 Cal. App. 532, 535-36 (1930).

Furniture Claim was not clearly erroneous. Because Edward failed to prove that this claim arose for bankruptcy purposes before either the 2008 or 2017 bankruptcy filings, neither discharge from these bankruptcy cases applied to White's 2023 state court action on the Furniture Claim.

### b. Loan Claim.

Edward similarly argues that the bankruptcy court clearly erred in finding that he failed to establish that the Loan Claim arose before his bankruptcies. He primarily focuses on the 2008 bankruptcy. He maintains that the weight of the conflicting evidence tips in his favor on this timing issue. We disagree. Edward was required to establish White's contempt of the 2008 discharge injunction by clear and convincing evidence. Based on the inconsistency of the evidence presented, the court correctly found that Edward failed to meet his evidentiary burden. Edward's mere disagreement with the court's finding does not establish that this finding regarding the timing of the Loan Claim was illogical, implausible, or lacking support in the record. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

That said, White conceded in her trial brief filed prior to the evidentiary hearing that her Loan Claim arose before the 2017 bankruptcy. Consequently, under § 524(a)(2), the discharge entered in that no-asset bankruptcy enjoined White's efforts to collect that debt despite her lack of notice. But to hold White in contempt of that discharge injunction, Edward

21

still needed to prove that White knew of the 2017 discharge. We address that issue in Section 2, below.

### c.  Settlement Claim.

The bankruptcy court did not specifically discuss the timing of the Settlement Claim. But in terms of when it arose for bankruptcy discharge purposes, the bankruptcy court evidently viewed the Settlement Claim as entirely derivative of the Furniture and Loan claims. Accordingly, the court seems to have implicitly concluded that the Settlement Claim arose—if at all—when the other two claims arose. Neither of the parties have challenged this aspect of the bankruptcy court's ruling. Accordingly, the remainder of our review assumes without deciding that the discharge entered in the 2008 bankruptcy did not apply at all to the Settlement Claim. But the 2017 discharge applied to at least the portion of the Settlement Claim arising from the Loan Claim.

### 2.  White's knowledge of the 2017 discharge.

Edward maintains that he presented uncontroverted evidence showing that White knew of the 2017 bankruptcy and discharge when she sued him in state court. The filing of the 2023 and 2024 state court lawsuits is the only actionable conduct Edward coherently and conspicuously complained of in his bankruptcy court papers. As explained above, White's knowledge of the 2017 discharge is irrelevant to her Furniture Claim because that claim arose well after the filing of that bankruptcy. But to show that she was in contempt for pursuing the Loan and Settlement

22

Claims, Edward needed to prove by clear and convincing evidence that White knew of his 2017 discharge.

According to Edward, White repeatedly has admitted her advance knowledge of the 2017 bankruptcy and discharge. He asserts that she made these admissions in papers she filed in the lawsuits on the Loan and Settlement Claims, which were filed in December 2023 and July 2024 respectively. But he failed to timely present to the bankruptcy court any documents that corroborate this assertion. Nor have we found any such documents in the bankruptcy court record of the contempt proceedings, which predominantly focused upon the 2008 bankruptcy and resulting discharge.

Edward additionally insists that he told White and her counsel about his 2017 bankruptcy and discharge when he responded in writing to her counsel's June 2024 demand letter concerning the Settlement Claim. But his written response only refers to the discharge entered in the 2008 case. It contains no mention of the 2017 bankruptcy and discharge. This is consistent with Edward's citations to other documents from the state court litigation, in which only the discharge in the 2008 bankruptcy is referenced. In each of these instances, Edward's factual assertions are either inconsistent with or unsupported by any documentary evidence before the bankruptcy court at the time it ruled on the contempt motion.

The bankruptcy court found credible White's live testimony that she was not aware of the 2017 bankruptcy and discharge until June 2025. Her

23

testimony countered Edward's uncorroborated claims regarding her knowledge. Furthermore, the court described his claims as vague and internally inconsistent. The record supports these findings. We have not seen anything in the record from the contempt proceedings that would lead us to conclude that the bankruptcy court's findings on these points were illogical, implausible, or without support in the record.

Finally, Edward points to a request for judicial notice he filed in the bankruptcy court on April 29, 2025. Edward served this request for judicial notice—which included a copy of his 2017 discharge—on both White and her counsel. By this late date, White evidently had notice of the 2017 discharge. According to Edward, this and similar documents he filed early on in the contempt proceedings demonstrate that White was lying when she later testified that she was unaware of the 2017 bankruptcy and discharge until June 3, 2025. However, we fail to see any meaningful difference for purposes of Edward's contempt motion whether White learned of the 2017 discharge in April 2025 or in June 2025. After all, the only conduct actionable under § 524(a)(2) that Edward complained of in his contempt filings was the commencement of the state court lawsuits in 2023 and 2024.

In other words, regardless of the exact date in 2025 that White learned of the 2017 discharge, this knowledge came to her too late to hold her in contempt for filing the state court lawsuits. By the time she received the April 29, 2025 request for judicial notice and a copy of the 2017

24

discharge, she had already dismissed the lawsuits on the Furniture Claim and the Loan Claim. At that time, she was proceeding only on her Settlement Claim. And White consistently explained that she considered the Settlement Claim to have arisen from the promise Edward and his mother allegedly made in April 2024 to pay White $35,000 in exchange for dismissal of the lawsuits on the Furniture Claim and the Loan Claim.

To support his contempt motion, Edward was obliged to prove by clear and convincing evidence that White "had sufficient notice of [the discharge injunction's] terms and the fact that [she] would be sanctioned if [she] did not comply." *Hansbrough v. Birdsell (In re Hercules Enters., Inc.)*, 387 F.3d 1024, 1028 (9th Cir. 2004) (citing *In re Dyer*, 322 F.3d at 1190–91). Because Edward presented no evidence indicating that White learned of the 2017 discharge before she commenced her state court lawsuits, the bankruptcy court's finding regarding White's knowledge of the 2017 discharge was not clearly erroneous.[11]

---

[11] At oral argument Edward's counsel argued that the bankruptcy court erroneously accepted White's *subjective belief* that the 2017 discharge did not apply. Counsel maintained that the court thereby erroneously failed to apply the objective standard required by *Taggart*. While *Taggart* adopted a standard that is "generally" objective in nature, 587 U.S. at 561, Edward was still required to prove that White knew of his 2017 bankruptcy and discharge. If a creditor does not know of the discharge order, she cannot reasonably or objectively have any basis to consider whether her conduct might be lawful under a discharge order that she is not even aware of. In contrast to White's situation, the creditors in *Taggart* indisputably knew of the discharge order; the only question was whether they had a reasonable basis for believing that the discharge did not apply to their conduct. Here, the court held that White did not even know of the 2017 discharge when she filed her 2023 and 2024 state court lawsuits.

## C.      The remainder of Edward's arguments.

Edward raises a host of other issues, most of which are beyond the scope of this appeal. The only order on appeal is the court's order denying his contempt motion for alleged violation of his two bankruptcy discharges. Nonetheless, Edward spends a great deal of time arguing about the validity and enforceability of White's claims against him. As explained above, the merits of White's claims are beyond the scope of the contempt motion. As did the bankruptcy court, we do not consider the validity of White's claims.

Edward similarly critiques the bankruptcy court for permitting the state court lawsuit on the Settlement Claim to move forward as against Maxine. He claims that Maxine is protected by the discharges he received in his 2008 and 2017 bankruptcies, but he cites no law supporting this novel proposition. Nor are we aware of any. To the contrary, the plain language of the discharge injunction statute makes clear that the discharge only prohibits actions to collect a discharged debt against the debtor who received that discharge; it does not protect their family members or others from attempts to collect that debt. *See* § 524(a)(2) (only enjoining acts to

---

Edward had the burden of proving White's knowledge of the 2017 bankruptcy at the time she filed the lawsuits he complains of. Yet, the record is devoid of any evidence that White knew of the 2017 discharge prior to 2025—when she learned of it during the course of the contempt proceedings. Absent White's knowledge of the 2017 discharge, Edward necessarily failed to prove any contemptuous violation of that discharge.

collect or recover discharged debts "as a personal liability of the debtor"); *see also* § 524(e) (with one exception not relevant here, providing that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."); *Patronite v. Beeney (In re Beeney)*, 142 B.R. 360, 363 (9th Cir. BAP 1992) (holding that the discharge injunction does not prohibit post-discharge lawsuits to the extent they are pursued in an attempt to collect a discharged debt from nondebtor entities).

The validity of White's alleged settlement with Maxine also is beyond the scope of this appeal. We express no opinion on White's alleged use of at least one discharged debt (the Loan Claim) as leverage to reach her agreement with Maxine. Given that White has conceded that the Loan Claim arose prior to the commencement of Edward's 2017 bankruptcy, the subsequent entry of the discharge in that no-asset chapter 7 discharged any such liability related to the Loan Claim regardless of whether White knew of the 2017 bankruptcy. *In re Heilman*, 430 B.R. at 218. On the other hand, while § 541(a)(2) enjoins any further collection of that debt from Edward, it does not enjoin such efforts to collect from a nondebtor. Ultimately, the efficacy of White's claims against Maxine will depend on applicable non-bankruptcy law, which will determine the extent of her liability to White.[12]

---

[12] Edward belatedly has attempted to invoke the discharge Maxine received in her own 2017 chapter bankruptcy. *See In re Maxine Laquanda Gilliam*, Case No. 6:17-bk-20076-SY (discharge entered March 19, 2018). But Maxine's discharge was beyond the scope of Edward's contempt motion. Nor does he have standing to assert her discharge

27

Edward further contends the bankruptcy court erred by ignoring his attempts to remove the action on the Settlement Claim to the bankruptcy court. We express no opinion on the merits of Edward's attempted removal because it is not legally relevant to the denial of his contempt motion.[13]

In addition, Edward attempts on appeal to present evidence that was not presented to the bankruptcy court prior to the close of the evidentiary hearing. We cannot consider this evidence as part of our appellate review. *Castro v. Terhune*, 712 F.3d 1304, 1316 n.5 (9th Cir. 2013); *see also Oyama v. Sheehan (In re Sheehan)*, 253 F.3d 507, 512 n.5 (9th Cir. 2001) ("[E]vidence that was not before the lower court will not generally be considered on appeal.").[14]

---

on her behalf. Besides, White's only claim against Maxine allegedly arose in 2024—years after Maxine's 2017 bankruptcy.

[13] Edward additionally complained that White should have dismissed him from the lawsuit on the Settlement Claim with prejudice instead of without prejudice. But nothing in § 524(a)(2) requires creditors to dismiss lawsuits against discharged debtors with prejudice.

[14] One of Edward's most oft repeated complaints on appeal is that the bankruptcy court should have considered admissions made by White in her April 22, 2024 opposition filed in the state court action on the Loan Claim. These alleged admissions, according to Edward, pertained to both the timing of that claim and White's knowledge of his bankruptcies. More specifically, according to Edward, White attached to that opposition a March 12, 2024 letter she wrote to the United States Trustee in which she attempted to persuade the United States Trustee to pursue Edward for alleged criminal conduct in violation of 18 U.S.C. § 157. In this letter, White stated that she made the $30,000 loan from which the Loan Claim arose in July 2008. But Edward has admitted that White's letter to the United States Trustee was not before the bankruptcy court when it took his contempt motion under submission. It is undisputed that he first presented this letter to the bankruptcy court as part of his papers seeking reconsideration of the denial of the contempt motion—in October 2025. Furthermore, as

None of the above tangential issues merit further attention than the brief discussion we have given them here.[15] Nor do whatever additional issues might be found in the interstices of Edward's appeal briefs.[16]

## CONCLUSION

For the reasons set forth above, we AFFIRM the bankruptcy court's order denying Edward's contempt motion.

---

we stated earlier, the denial of Edward's reconsideration motion is beyond the scope of this appeal.

[15] Edward also complains that the bankruptcy court's final ruling after the September evidentiary hearing was inconsistent with certain remarks the court made at the initial hearing held on June 3, 2025. But the bankruptcy court was not bound by those prior remarks. It is doubtful that those remarks rose to the level of being interlocutory rulings. But even if they did, the bankruptcy court had the inherent power, full authority, and broad discretion to modify or rescind them as part of its final ruling. *See City of L.A., Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001); *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989).

[16] On May 21, 2026, after this Panel took this appeal under submission, Edward filed a supplemental request for judicial notice. We decline to consider it, as no further filings from the parties were requested or authorized. Furthermore, as indicated in this decision, the subject matter of his supplemental judicial notice request concerns issues, facts, and documents not properly before this panel as part of this appeal. Accordingly, Edward's supplemental request for judicial notice is hereby ORDERED DENIED.